IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
December 12, 2017 Session

## STATE OF TENNESSEE v. MENA MEKHAEN BOUTROUS

**Appeal from the Criminal Court for Davidson County**
**No. 2014-D-3002    Monte Watkins, Judge**
_____

### No. M2017-00835-CCA-R3-CD
_____

Defendant, Mena Mekhaen Boutrous, was convicted of two counts of aggravated arson and one count of attempted first degree murder after a bench trial. The trial court merged the two counts of aggravated arson and sentenced Defendant to twenty years for the conviction for aggravated arson and twenty years for the conviction for attempted first degree murder, to be served concurrently. On appeal, Defendant argues that: (1) the trial court erred by excluding evidence of Defendant's mental health; (2) the evidence was insufficient to support the convictions; and (3) the sentences were excessive. After a review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

TIMOTHY L. EASTER, J., delivered the opinion of the court, in which NORMA MCGEE OGLE and CAMILLE R. MCMULLEN, JJ., joined.

Manuel B. Russ, Nashville, Tennessee, for the appellant, Mena Mekhaen Boutrous.

Herbert H. Slatery III, Attorney General and Reporter; Alexander C. Vey, Assistant Attorney General; Glenn R. Funk, District Attorney General; and Roger Moore, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

In October of 2014, the Davidson County Grand Jury indicted Defendant for two counts of aggravated arson and one count of attempted first degree murder after a fire at

Tornado Wireless in Nashville. Because of the fire, the store and its owner, Rimon Boutrous, were burned.[1] Defendant waived his right to a jury trial.

At the bench trial, the following facts were introduced. On a day prior to May 10, 2014, Defendant purchased a used cell phone from Tornado Wireless, the victim's store. Tornado Wireless was located in a strip mall next to a grocery store. The store specialized in selling used cell phones and working on broken or damaged cell phones. The building was owned by Ahmed Sankari, who also operated the grocery store. On May 10, the victim was working at Tornado Wireless along with one of his employees, Mohammed Salem. At some point that day, Defendant entered the store and demanded a refund on a cell phone he had purchased at the store. According to the victim, Defendant threatened to kill the victim if he did not get a refund. The victim informed Defendant that he operated the store with a strict "no refunds" policy.

Defendant exited the store and retrieved a container of gasoline from the trunk of his car. Defendant proceeded to throw gasoline at the store building and inside the store. The victim was in the back of the store at the time Defendant returned. The victim heard the disturbance, walked to the front of the store, and asked Defendant what he was doing. The victim tried to push Defendant out the door. The victim testified that Defendant doused him with gasoline. As Defendant neared the door to the parking lot, he ignited a lighter in his opposite hand. Both the store and the victim were immediately engulfed in flames. Mr. Sankari could see black smoke emanating from Tornado Wireless.

Officer Jiyayi Suleyman of the Metro Nashville Police Department was responding to a "domestic call" in the area near Tornado Wireless. Officer Suleyman "was flagged down by numerous individuals saying there was an individual on fire across the street of Lafayette." When he arrived, Tornado Wireless was on fire and two men were "rustling, tussling" in a physical altercation outside the store. The men were later identified by Officer Suleyman as Defendant and Mohammed Salem.

Soon thereafter, Officer Suleyman saw the victim exit the burning store, "yelling and screaming." Officer Suleyman described that the victim's skin was "coming off his hands and facial area" like "when you light a candle on fire and how the wax drips off." Officer Suleyman tried to get the victim to remain calm despite his obvious pain. The victim, who was twenty-two years of age at the time of the incident, suffered burns on over 60% of his body. At trial, the victim explained that he could no longer "lead his life like a normal person" and it "would be better for [him]" to die. The victim was in the hospital for approximately two months after the incident and still required treatment for residual health problems.

---

[1] The victim is not related to Defendant. In order to maintain clarity, we will not refer to either Defendant or the victim by their surname. We mean no disrespect in doing so.

The crowd outside the building reported to the officer that Defendant started the fire. Officer Suleyman spoke to Defendant who was described as "calm and relaxed." Defendant explained to the officer that he came to the store seeking a refund for his purchase and, when the victim refused, Defendant brought the gasoline can into the store to "scare the victim into giving a refund for the phone."

Mr. Sankari was working at his grocery store next door when the incident took place. Mr. Sankari recognized Defendant as a customer of the grocery store. Mr. Sankari stated that Defendant stood out because he had an "eye problem" where his "eyelashes keep blinking." Mr. Sankari asked the victim about Defendant. The victim told Mr. Sankari that Defendant had a "medical issue" for which he was "under treatment."

The building sustained substantial fire damage near the entrance and the countertop inside the store. Kevin Neville, the assistant fire marshal and fire investigator, smelled gasoline vapor "outside in the parking lot." The presence of gasoline was evident inside the store; there was a clear burn pattern inside the store with "heavy charring" on the countertop. Gasoline had clearly been poured "along the counter and on the floor." The only clear point of origin for the fire was the victim himself. It appeared to Mr. Neville that the fire started near the front of the store. Mr. Neville surmised from his investigation that a "gasoline vapor explosion" occurred inside the store near the front of the store.

Defendant's brother, George Boutrous, testified that Defendant came to the United States in 2006. George came to the United States in 2012. When Mr. Boutrous first arrived, he assisted Defendant with taking care of various tickets, court costs, and fees. George helped Defendant get a driver's license and access to a car. Defendant eventually moved in with George. Over objection from the State, he testified that Defendant was prescribed medication for and suffered from mental illness, that Defendant did not "sleep well," and that Defendant started looking "differently" beginning in 2012. George claimed Defendant talked to an "invisible person" and would "fight[] with that person who was not actually there." According to George, Defendant did not regularly take the medication that he was prescribed. In fact, Defendant had neglected to take his medication for approximately "forty days to two months" prior to the incident. George also testified that Defendant smoked marijuana on a regular basis.

Defendant testified in his own defense. He claimed that the victim sold him a stolen cell phone. Defendant testified that he took the phone to the store in order to obtain a refund when the victim "started to pick a fight." Defendant walked out of the store, heading to his car to get something "from the trunk and fight." Defendant was going to get some type of jack rod or metal tool but found only a gasoline can. He took the gasoline can into the store to try to "scare" the victim into giving him a refund for the

phone.  Defendant admitted that he poured gasoline on the counter in front of the victim, covering as much space as possible with gasoline.  The victim tried to wrestle the gasoline can out of Defendant's hands.  Defendant claimed that during the struggle, gasoline spilled onto the victim's shirt.  Defendant eventually got a few steps outside the store before he lit a cigarette lighter at his side.  Defendant then recalled the victim running toward him just before "everything was on fire."

Defendant noted that he took several medications, including Haloperidol, Bentropine, and Trazodone and that he had been hospitalized for a mental condition prior to the incident.  He claimed that he was not taking his medication on the day of the incident and, at the time, was also smoking marijuana daily.  Defendant admitted that he smoked marijuana shortly before the incident.  Defendant insisted that prior to the incident, he and the victim were friends who regularly spent time together.  In fact, Defendant testified that he merely wanted to scare the victim after the victim refused to give him a refund but that the victim actually threatened Defendant during the incident.  Defendant admitted that he was aware of the victim's no refund policy but thought that their friendship may influence the victim's decision to waive the refund policy.  Defendant also testified that he was aware the victim was leaving for Egypt the next day and that Defendant may never receive his refund if he did not ask for it on the day of the incident.  Defendant explained that this was "the worst thing that [ever] happened to [him]."

At the conclusion of the proof, the trial court found Defendant guilty of both counts of aggravated arson and one count of attempted first degree murder.  The trial court merged the two counts of aggravated arson.  At a subsequent sentencing hearing, the trial court sentenced Defendant to twenty years for the conviction for aggravated arson and twenty years for the conviction for attempted first degree murder, to be served concurrently.

On appeal, Defendant challenges the trial court's refusal to allow the defense to admit mental health records, the sufficiency of the evidence, and the sentence.

*Analysis*

*I. Admission of Medical Records*

Defendant argues on appeal that the trial court improperly "prohibited the defense from introducing evidence of [Defendant's] mental health at the trial on the matter" because the mental health records disputed the fact that Defendant had the necessary mental state to commit the offenses of which he was convicted.  The State, on the other hand, submits the mental health records do nothing to negate Defendant's mental state at

- 4 -

the time of the incident and, therefore, Defendant has not shown that the evidence was critical to the defense.

Prior to trial, Defendant filed a motion to admit medical records showing his history of mental illness and drug use prior to and at the time of the offenses, in accordance with Tennessee Rule of Evidence 803(4), as well as a summary of relevant facts from those records pursuant to Tennessee Rule of Evidence 1006. Specifically, Defendant sought to introduce records from Middle Tennessee Mental Health Institute, Centerstone Community Mental Health Center, and Correctcare. According to Defendant, the mental health records would indicate that Defendant was hospitalized in October 2011 and received a diagnosis of "a substance induced psychotic disorder with hallucinations; PTSD; cannabis abuse; and alcohol abuse." Defendant reported to medical personnel that he "heard voices." A mental status examination revealed Defendant to be "calm and cooperative" as well as "alert and oriented." Defendant was also found to lack "the ability to avoid danger" and possessed poor judgment. Defendant responded well to medication but was hospitalized again about one month later. This time, Defendant did not report hallucinations and, again, responded to the administration of medication. Defendant was evaluated again a few years later, in January 2013, after encouragement from his brother. This evaluation listed Defendant's diagnosis as schizophrenia and cannabis abuse. In January 2014, Defendant claimed he was taking his medication, but it was reported by his brother that he was actually refusing to take the medication. A final evaluation in April 2014, less than two weeks prior to the offense, revealed that Defendant was not taking his medication regularly but did not report problems with his mood or the occurrence of any outbursts. Following incarceration, Defendant's mental health records indicated "chronic simple schizophrenia" as one of his problems.

After hearing argument on the motion, the trial court noted that medical records are generally "admissible for medical diagnosis and treatment purposes, but not so much for determining guilt or innocence or lack of capacity in a criminal case." In other words, "to use medical records to negate mens rea in and of themselves . . . is not adequate." The trial court noted that expert testimony coupled with the medical records could make a difference as far as admissibility. The trial court ultimately denied the motion to admit the records.

Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. However, relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Tenn. R. Evid. 403. Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."

Tenn. R. Evid. 801(c). As a general rule, hearsay is not admissible during a trial, unless the statement falls under one of the exceptions to the rule against hearsay. *See* Tenn. R. Evid. 802. In this case, the medical records are not admissible unless they qualify under a hearsay exception. Tennessee Rule of Evidence 803(4) is a hearsay exception allowing introduction of statements made for the purpose of medical diagnosis and treatment. The Rule provides that "[s]tatements made for purposes of medical diagnosis and treatment describing medical history; past or present symptoms, pain, or sensations; or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis and treatment" are admissible as an exception to the general exclusion of hearsay testimony. Tenn. R. Evid. 803(4).

While medical records may be admissible under Rule 803(4), they may or may not be relevant to an issue of consequence in a criminal case, such as determining guilt or innocence or lack of capacity. Of course, diminished capacity is not a defense to a criminal charge, but evidence of diminished capacity is admissible to negate mens rea. *See State v. Ferrell*, 277 S.W.3d 372, 379 (Tenn. 2009) (citing *State v. Hall*, 958 S.W.2d 679, 690-91 (Tenn. 1997)). Such evidence is usually introduced through expert testimony showing that a defendant was incapable of forming a criminal intent by virtue of an impaired mental condition. Generally, expert testimony regarding a defendant's capacity or lack of capacity to form the mental state required for the commission of an offense is admissible if it satisfies "general relevancy standards as well as the evidentiary rules which specifically govern expert testimony." *Hall*, 958 S.W.2d at 689. Under Tennessee law, evidence of a mental disease or defect that does not rise to the level of an insanity defense is nevertheless admissible to negate elements of specific intent. *State v. Phipps*, 883 S.W.2d 138, 149 (Tenn. Crim. App. 1994). In *Hall*, our supreme court explained "diminished capacity" as follows:

> [D]iminished capacity is not considered a justification or excuse for a crime, but rather an attempt to prove that the defendant, incapable of the requisite intent of the crime charged, is innocent of that crime but most likely guilty of a lesser included offense. Thus, a defendant claiming diminished capacity contemplates full responsibility, but only for the crime actually committed. In other words, "diminished capacity" is actually a defendant's presentation of expert, psychiatric evidence aimed at negating the requisite culpable mental state.

958 S.W.2d at 688 (citations omitted). However, the *Hall* court cautioned that "such evidence should not be proffered as proof of 'diminished capacity.' Instead, such evidence should be presented to the trial court as relevant to negate the existence of the culpable mental state required to establish the criminal offense for which the defendant is being tried." *Id.* at 690. Our supreme court emphasized that "'[i]t is the showing of [a] lack of capacity to form the requisite culpable mental intent [due to a mental disease or

defect] that is central to evaluating the admissibility of expert psychiatric testimony on the issue.'" *State v. Faulkner*, 154 S.W.3d 48, 56-57 (Tenn. 2005) (quoting *Hall*, 958 S.W.2d at 690).

In *State v. Ferrell*, 277 S.W.3d 372, 379 (Tenn. 2009), our supreme court clarified that the "decision in *Hall* established that the [mental health] testimony is properly admissible if it satisfies the relevancy and expert testimony provisions in the Tennessee Rules of Evidence and its content indicates that a defendant lacked the capacity to form the required mental state for an offense. . . ." *Id.* at 379. Our supreme court explained that the *Hall* holding "was based upon the broader legal principle that 'expert testimony relevant to negating intent is admissible in Tennessee even though diminished capacity is not a defense.'" *Id.* (quoting *Hall*, 958 S.W.2d at 691). The court further explained that "*Hall* recognized that a defendant may negate an element of the offense as a defense to the prosecution." *Id.* at 380. The *Hall* court explained that

> to gain admissibility, *expert* testimony regarding a defendant's incapacity to form the required mental state must satisfy the general relevancy standards as well as the evidentiary rules which specifically govern expert testimony. Assuming that those standards are satisfied, psychiatric evidence that the defendant lacks the capacity, because of mental disease or defect, to form the requisite culpable mental state to commit the offense charged is admissible under Tennessee law.

958 S.W.2d at 689 (emphasis added).

Rule 702 of the Tennessee Rules of Evidence addresses the admissibility of opinion testimony of expert witnesses:

> If scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise.

The determining factor is "whether the witness's qualifications authorize him or her to give an informed opinion on the subject at issue." *State v. Stevens*, 78 S.W.3d 817, 834 (Tenn. 2002). Evidence constitutes "'scientific, technical, or other specialized knowledge,' if it concerns a matter that 'the average juror would not know, as a matter of course.'" *State v. Murphy*, 953 S.W.2d 200, 203 (Tenn. 1997) (quoting *State v. Bolin*, 922 S.W.2d 870, 874 (Tenn. 1996)). "Testimony in the form of an opinion . . . otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." Tenn. R. Evid. 704. Although the rules of evidence permit expert witnesses to rely upon reliable hearsay in forming their opinions, the rules do not permit

otherwise inadmissible evidence to be admitted under the guise of the expert's opinion unless the proponent of the evidence can show that the prejudicial effect of the evidence is substantially outweighed by the probative value of the evidence in assisting the jury's understanding of the expert's opinion. *See* Tenn. R. Evid. 703; *State v. Debra Elaine Moore Kirk*, No. E2010-01390-CCA-R3-CD, 2011 WL 5910201, at *5 (Tenn. Crim. App. Nov. 28, 2011), *perm. app. denied* (Tenn. Apr. 19, 2012).

Defendant argues on appeal that the medical records were admissible as "[s]tatements for the purposes of medical diagnosis and treatment describing medical history; past or present symptoms . . ." in accordance with Tennessee Rule of Evidence 803(4). Moreover, he argues that the trial court erred by determining that the evidence was not relevant or admissible under *Hall* and *Ferrell*. However, in this case, Defendant merely sought to introduce volumes of medical records from years of treatment, not a specific set of medical records dealing with interpretation of Defendant's medical condition at the time of the incident. Moreover, Defendant did not seek to submit testimony from a mental health expert who had diagnosed Defendant with a recognized mental health issue that negated his mens rea or prohibited Defendant from forming the requisite mens rea at the time of the incident. No expert was offered to interpret the medical records. While the medical records by themselves were potentially relevant and arguably admissible under Tennessee Rule of Evidence 803(4), Defendant never established their relevance. Without expert testimony to explain the effect of any mental illness, we agree with the trial court's assessment that the medical records were not admissible. The trial court did not abuse its discretion. Defendant is not entitled to relief on this issue.

Defendant also argues that the exclusion of the medical records somehow prohibited him from presenting a defense. He cites *Chambers v. Mississippi*, 410 U.S. 234, 302 (1973), and *State v. Brown*, 29 S.W.3d 427, 432 (Tenn. 2000), to support his argument. "Exclusions of evidence may violate the Due Process Clause of the Fourteenth Amendment of the United States Constitution even if the exclusions comply with rules of evidence." *State v. Flood*, 219 S.W.3d 307, 315-16 (Tenn. 2007). "Principles of due process require that a defendant in a criminal trial have the right to present a defense and to offer testimony." *Id.* at 316 (citing *Chambers*, 410 U.S. at 294; *Brown*, 29 S.W.3d at 431). In order to determine whether the exclusion of this evidence rises to the level of a constitutional violation, we consider whether: (1) the excluded evidence is critical to the defense; (2) the evidence bears sufficient indicia of reliability; and (3) the interest supporting exclusion of the evidence is substantially important. *Brown*, 29 S.W.3d at 433-34 (citing *Chambers*, 410 U.S. at 298-301). We must carefully consider the facts of the case to determine whether the constitutional right to present a defense was violated by this exclusion of evidence. *See id.* at 433.

Here, as mentioned above, Defendant failed to establish the relevance of the mental health records because he never established how or why the mental health records were relevant to negate the mens rea. Without establishing the threshold relevance, Defendant cannot show that the evidence was critical to the defense. Defendant was not prevented from presenting a defense by the trial court's exclusion of the mental health records. In fact, both he and his brother testified, even if on a limited basis, as to Defendant's existing mental health issues. Defendant is not entitled to relief on this issue.

## II. Sufficiency of the Evidence

Defendant argues that the evidence is not sufficient to support the convictions. Specifically, he argues that "the proof demonstrates clearly [Defendant] set fire to [the victim] as the starting point of the incident" and the "structure was burned because of the excess gasoline that was spilled and/or poured in the business." In other words, the proof did not demonstrate that Defendant was "knowingly setting the structure on fire." With respect to the attempted first degree murder conviction, Defendant argues that there was no evidence of premeditation. The State, on the other hand, insists that the evidence is sufficient to support the convictions.

When a defendant challenges the sufficiency of the evidence, this Court is obliged to review that claim according to certain well-settled principles. A guilty verdict removes the presumption of innocence and replaces it with a presumption of guilt. *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992) (citing *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973)). The burden is then shifted to the defendant on appeal to demonstrate why the evidence is insufficient to support the conviction. *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). The relevant question the reviewing court must answer is whether any rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt. *See* Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). On appeal, "the State is entitled to the strongest legitimate view of the evidence and to all reasonable and legitimate inferences that may be drawn therefrom." *State v. Elkins*, 102 S.W.3d 578, 581 (Tenn. 2003). As such, this Court is precluded from re-weighing or reconsidering the evidence when evaluating the convicting proof. *State v. Morgan*, 929 S.W.2d 380, 383 (Tenn. Crim. App. 1996); *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Moreover, we may not substitute our own "inferences for those drawn by the trier of fact from circumstantial evidence." *Matthews*, 805 S.W.2d at 779. Further, questions concerning the credibility of the witnesses and the weight and value to be given to evidence, as well as all factual issues raised by such evidence, are resolved by the trier of fact and not the appellate courts. *State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn.

2009)).  In a bench trial, the trial judge's verdict is entitled to the same weight on appeal as a jury verdict.  *State v. Farrar*, 355 S.W.3d 582, 585 (Tenn. Crim. App. 2011) (citing *State v. Holder*, 15 S.W.3d 905, 911 (Tenn. Crim. App. 1999)).

### A.  Aggravated Arson

Arson is committed when a person "knowingly damages any structure by means of a fire or explosion: (1) Without the consent of all persons who have a possessory, proprietary or security interest therein; or (2) With intent to destroy or damage any structure to collect insurance for the damage or destruction or for any unlawful purpose." T.C.A. § 39-14-301.  Aggravated arson occurs when "a person commits arson as defined in § 39-14-301 . . . : (1) [w]hen one (1) or more persons are present therein; or (2) [w]hen any person . . . suffers serious bodily injury as a result of the fire or explosion." T.C.A. § 39-14-302.

Here, in the light most favorable to the State, the proof established that Defendant went to Tornado Wireless to obtain a refund for the purchase of a cell phone.  When the victim refused to give Defendant a refund, Defendant walked to the parking lot, opened his trunk, retrieved a can of gasoline, and walked back into the store.  Once inside the store, Defendant poured gasoline on the counter inside the store.  Defendant knew that the gasoline was capable of catching fire.  When the victim tried to get Defendant to stop by pushing him out of the store, Defendant threw gasoline on the victim.  Defendant then pulled a lighter out of his pocket and ignited it by his side.  In the process, the victim and the store caught on fire.  There was "substantial fire damage" at the entrance to the store and the victim appeared to be the point of origin of the fire.  The victim suffered extensive burns on over 60% of his body.

Defendant claims that he only set the victim on fire, rather than the store, so he did not knowingly cause damage to the store.  In *State v. Gene Shelton Rucker, Jr.*, No. E2002-02101-CCA-R3-CD, 2004 WL 2827004, at *10 (Tenn. Crim. App. Dec. 9, 2004), *perm. app. denied* (Tenn. Mar. 21, 2005), this Court determined that aggravated arson is not a result-of-conduct offense.  Aggravated arson does not "require that a defendant act with an awareness that setting a fire or creating an explosion is reasonably certain to cause damage to a structure." *Id.*  Rather, "the nature of the conduct—creating a fire or explosion—that causes the damage to the structure is consequential and central to the offense." *Id.*  Thus, the knowing mens rea for aggravated arson is satisfied where "the person is aware of the nature of the conduct" or the accompanying circumstances. *See id.*; T.C.A. § 39-11-302(b).  The State needs only to show that Defendant knowingly started a fire that ultimately damaged the store and that, as a result, the victim was seriously injured.  Here the proof clearly established this evidence.

In fact, this Court has affirmed a conviction for aggravated arson based on facts similar to those presented herein. In *State v. Sharon Donella Phillips*, No. E2014-00996-CCA-F3-CD, 2015 WL 2374596, at *4 (Tenn. Crim. App. May 15, 2015), *no perm. app. filed*, the defendant's conviction for aggravated arson was upheld where the facts showed that the defendant assaulted the victim before throwing a cup of gasoline on the victim's body and lighting it on fire, causing the victim and his house to catch on fire and causing serious bodily injury to the victim. Here, like in *Sharon Donella Phillips*, Defendant admits that he knowingly set the victim on fire, which in turn damaged the victim's store. Consequently, the nature of Defendant's conduct sufficiently established the commission of aggravated arson, and, as such, the evidence adduced at trial supports Defendant's convictions. Defendant is not entitled to relief on this issue.

## B. Attempted First Degree Murder

Defendant argues that there was no proof of premeditation and, therefore, his conviction for attempted first degree murder must be reversed. The State points to several decisions and choices made by Defendant during the course of the events that led up to the fire that could be easily interpreted as premeditation—Defendant's retrieval of the gasoline from the trunk, the pouring of the gasoline on the counter in the store and later on the victim, and the igniting of the lighter in proximity of the gasoline—along with Defendant's calm demeanor after the event as supporting the conviction for attempted first degree murder.

As relevant in this case, a person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense, "[a]cts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense." T.C.A. § 39-12-101(a)(3); *see State v. Dickson*, 413 S.W.3d 735, 745 (Tenn. 2013). "Conduct does not constitute a substantial step . . . unless the person's entire course of action is corroborative of the intent to commit the offense." *Id.* § 39-12-101(b). First degree murder is the premeditated and intentional killing of another person. T.C.A. § 39-13-202(a)(1). Premeditation is defined as "an act done after the exercise of reflection and judgment." *Id.* § 39-13-202(d). This section further defines premeditation as follows:

> "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

*Id.*

The existence of premeditation is a question of fact for the trier of fact to determine and may be inferred from the circumstances surrounding the offense. *State v. Young*, 196 S.W.3d 85, 108 (Tenn. 2006); *State v. Suttles*, 30 S.W.3d 252, 261 (Tenn. 2000). Factors that may support the existence of premeditation include, but are not limited to, the use of a deadly weapon upon an unarmed victim, the particular cruelty of the killing, the infliction of multiple wounds, declarations by the defendant of an intent to kill, lack of provocation by the victim, failure to aid or assist the victim, evidence of procurement of a weapon, preparations before the killing for concealment of the crime, destruction and secretion of evidence of the killing, and calmness immediately after the killing. *State v. Kiser*, 284 S.W.3d 227, 268 (Tenn. 2009); *State v. Leach*, 148 S.W.3d 42, 53-54 (Tenn. 2004); *State v. Davidson*, 121 S.W.3d 600, 615 (Tenn. 2003); *Bland*, 958 S.W.2d 651, 660 (Tenn. 1997). This Court has also noted that the jury, or in this case the trial court, may infer premeditation from any planning activity by the defendant before the killing, evidence concerning the defendant's motive, and the nature of the killing. *State v. Bordis*, 905 S.W.2d 214, 222 (Tenn. Crim. App. 1995) (citation omitted).

The proof in this case, in a light most favorable to the State, shows that Defendant went to Tornado Wireless to demand a refund. When the victim refused, Defendant admittedly wanted to "get back" at the victim. The victim testified that Defendant threatened to kill him if he did not give him a refund. Defendant walked to his car to get a weapon of some sort to "fight" the victim. He returned to the store with a gasoline can and spread the gasoline all over the counter. Defendant himself admitted that he wanted to scare the victim into giving him a refund. The victim tried to remove Defendant from the store and Defendant threw gasoline on the victim in the process. Defendant then reached into his pocket, took out a lighter, and ignited the lighter. At this point, the victim was unarmed and on fire.

Defendant claims that he was "infuriated" after his "unfair treatment" by the victim and that there is no way that his actions could be perceived as premeditated. To the contrary, the evidence was sufficient to support a conviction for attempted first degree murder. Defendant took a substantial step toward the commission of the offense when he poured gasoline on the unarmed victim, lit him on fire, and then remained "calm and relaxed" after the incident, even admitting his intent to intimidate the victim to authorities while the victim's skin was coming off his hands and face like candle wax. *See* T.C.A. § 39-12-101(a)(3); *Dickson*, 413 S.W.3d at 745. By its verdict, the trial court clearly determined that Defendant's actions were premeditated. Again, we may not substitute our own "inferences for those drawn by the trier of fact from circumstantial evidence." *Matthews*, 805 S.W.2d at 779. The evidence is sufficient to support the conviction. Defendant is not entitled to relief on this issue.

*III. Sentencing*

Lastly, Defendant complains that his sentence is excessive. Specifically, he complains about the weight the trial court gave to enhancement and mitigating factors, the application of certain enhancement factors, and the failure of the trial court to properly apply sentencing principles.

When a defendant challenges the length or manner of service of a within-range sentence, this Court reviews the trial court's sentencing decision under an abuse of discretion standard with a presumption of reasonableness. *State v. Caudle*, 388 S.W.3d 273, 278-79 (Tenn. 2012); *State v. Bise*, 380 S.W.3d 682, 708 (Tenn. 2012). This presumption applies to "within-range sentencing decisions that reflect a proper application of the purposes and principles of the Sentencing Act." *Bise*, 380 S.W.3d at 707. A trial court abuses its discretion in sentencing when it "applie[s] an incorrect legal standard, or reache[s] a decision which is against logic or reasoning that cause[s] an injustice to the party complaining." *State v. Shuck*, 953 S.W.2d 662, 669 (Tenn. 1997) (citing *Ballard v. Herzke*, 924 S.W.2d 652, 661 (Tenn. 1996)). The defendant bears the burden of proving that the sentence is improper. T.C.A. § 40-35-101, Sentencing Comm'n Cmts.

In reaching its decision, the trial court must consider the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on enhancement and mitigating factors; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; (7) any statement by the defendant in his own behalf; and (8) the potential for rehabilitation or treatment. *See* T.C.A. § 40-35-102, -103, -210(b); *see also Bise*, 380 S.W.3d at 697-98. Additionally, the sentence imposed "should be no greater than that deserved for the offense committed" and also "should be the least severe measure necessary to achieve the purposes for which the sentence is imposed." T.C.A. § 40-35-103(2), (4).

This Court will uphold the sentence "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Bise*, 380 S.W.3d at 709-10. The weighing of various enhancement and mitigating factors is within the sound discretion of the trial disturb the sentence even if we had preferred a different result. *See id.* at 346.

At the sentencing hearing, the victim testified at length as to his continued health issues as a result of the burns. The victim testified to over a "million dollars" in medical

bills, horrible scarring, and constant pain.[2]  In his words, "everything is horrible."  The Defendant expressed remorse but claimed that he was "not fully conscious of what [he] was doing" at the time of the incident.

At the conclusion of the sentencing hearing, the trial court commented that Defendant committed a "very heinous offense."  The trial court also noted from the presentence report that Defendant had a prior criminal record, including two convictions for possession of drugs, one conviction for criminal trespass, and one conviction for patronizing prostitution.  *See* T.C.A. § 40-35-114(1).  The trial court also noted that Defendant treated the victim with exceptional cruelty and had no hesitation about committing an offense where the risk of human life was great.  *See* T.C.A. § 40-35-114(5), (10).  In addition, the trial court determined that the injuries sustained by the victim were particularly great and that Defendant had not complied with the conditions of supervised relief in the past.  *See* T.C.A. § 40-35-114(6), (8).  The trial court found Defendant's history of mental illness mitigated his actions but that the "enhancement factors outweigh the mitigating factors."  *See* T.C.A. § 40-35-113(8).  The trial court merged the two counts of aggravated arson into one count and, after fully considering the purposes and principles of sentencing, imposed concurrent sentences of twenty years for both aggravated arson and attempted first degree murder, which are both Class A felonies.  *See* T.C.A. §§ 39-14-302(b); 39-11-117(a)(2).  The sentences are within the appropriate range and are presumed reasonable.  *See* T.C.A. § 40-35-112(a)(1) (listing sentencing range of "not less than fifteen (15) nor more than twenty-five (25) years" for a Class A felony).  Other than complaining about the weight given to the enhancement and mitigating factors, Defendant has not shown that the trial court abused its discretion in sentencing him to an effective sentence of twenty years.  Defendant is not entitled to relief on this issue.

*Conclusion*

For the foregoing reasons, the judgments of the trial court are affirmed.

<br>

_____
TIMOTHY L. EASTER, JUDGE

---

[2] The victim testified that Vanderbilt Hospital has a "lien on [him]" and has garnished his paycheck.  Counsel for Defendant suggested that victim explore bankruptcy.